Welcome to the Fourth Circuit. We have three cases this morning for hearing. The first is 22-4261, United States v. Congo, I believe. I hope I said that right. Ms. Coleman. Thank you. May it please the Court, good morning. My name is Megan Coleman on behalf of the appellant, Eunice Nkongho. In this case, the Court is asked to decide whether the warrantless seizure of Ms. Nkongho's cell phone at the U.S. border that was seized for the purpose of conducting a forensic search of the phone to look for communications about a transnational fraud scheme exceeded the scope of the border exception to the warrant requirement. I will attempt to demonstrate today that, number one, the record does not support that the agents reasonably believed that there was digital contraband on her phone. Number two, that Supreme Court precedent does not demonstrate that border agents were permitted to search for evidence of communications that might relate to a border offense. And number three, even in United States v. Colses, the Fourth Circuit said that the direct link that supported agents looking for ongoing evidence of a crime was that Colses was actually at the border. With respect to the first argument, the government raises an argument on appeal that it did not raise below, which is that the border exception was justified because Ms. Nkongho's device might have had digital contraband on it in the form of USML photos or data. But the record from the suppression hearing belies that this is what the agents reasonably believed at the time of the seizure. Agent Merker, the lead agent who was directing the investigation, testified that in terms of contraband, he was only looking for cables and outstanding military equipment in her luggage on her way out. That's at Joint Appendix 521. Therefore, he only instructed border agents to search her luggage and not her electronic devices because he did not suspect that there might be digital contraband at that time. Whereas Agent Merker admitted that he sent the customs agents a photograph of the cables to look for in the luggage, he never sent the border agents specifications for technical data that the agents should be looking for in the outbound search. Moreover, at the suppression hearing, Agent Merker never testified that he suspected that there was any USML photos or technical data on Ms. Nkongho's device. In fact, the only contraband that they were looking for before returning the phone to Ms. Nkongho was child pornography. Furthermore, in discussing what the agent reviewed on co-conspirator Razak's phone before the seizure of Ms. Nkongho's phone, the agent did not report seeing any USML digital contraband in the communications between Razak and Nkongho or even between Razak and Unakalu, the husband of Ms. Nkongho. The agents did not testify to the last time that Razak and Nkongho communicated with one another or how recently in time Unakalu purportedly asked Razak to involve Nkongho in the offense. Now what you're challenging is the seizure you said of the phone on the 20th? Yes, Your Honor, on the 20th is when the phone was seized. And you're only challenging the seizure of the phone. But the search warrant dealt with the search of six called target devices. So you're not challenging the other five searches of the other five devices? For purposes of this argument and what ended up occurring in the case in terms of the evidence that was admitted to the jury, my focus is on Ms. Nkongho's electronic devices, like her cell phone, that resulted in the evidence that the government then used at trial against her. And you're not challenging anything about the trial except, so you've narrowed it down to what they got off of her phone, correct? Yes, Your Honor. Which was as a result of the search warrant issued on the 29th. Yes, Your Honor. Whatever the month was, March or something. So the other five target devices are irrelevant here. Yes, Your Honor.  And the probable cause for the search warrant the magistrate judge relied on related to what they knew about her as of the 20th. Yes, Your Honor. Not the 29th. It didn't change any between the 20th and 29th. Yes, I believe Agent Marker testified that there was no new information. There was no new information. So when the magistrate judge found probable cause on the 29th, that meant, it means, from a legal standpoint, there was probable cause to search, seize and search, on the 20th. Correct? So, there was probable cause to search, but the distinction... There was probable cause to search and seize on the 20th. They had probable cause to search and seize on the 20th because the magistrate judge ruled on the 29th that there was probable cause and issued a search warrant for the target devices, which included the cell phone. Yes, Your Honor. So when they stopped her at the Miami airport on the 20th, the officers, the border officers, had probable cause. The distinction that I would like to make, Your Honor, is... They had probable cause because the judge so found on the 29th. Yes or no? I would concede that they had probable cause to a domestic related offense, not necessarily a transnational. Well, they issued a search warrant. A search warrant. They issued a search warrant on the 29th and ordered, commanded the officers to search the devices, including the cell phone. Commanded them to do so on the face of the warrant. Your Honor, in directing the court's attention to Joint Appendix page 604, the crimes that the agent veered the phone would relate to, although I will concede that one of the offenses listed was international traffic and arms regulations violations. However, the other crimes that the agent said the devices would relate to were domestic crimes. Mail fraud, wire fraud, interstate transportation of stolen property, and sale or receipt of stolen property. And my argument, Your Honor, is that the facts that were listed in the application for the warrant is a reason to support probable cause related to domestic offenses. So you're challenging probable cause or you're not challenging probable cause? What I'm saying is that I don't think that this court can say that because the warrant was issued that necessarily meant that there was probable cause that a transnational offense was occurring. There's probable cause to search. There's probable cause to search, but the... If there's probable cause to search, they're searching for evidence of crimes that were identified to the magistrate judge. In order to initially seize the phone at the border pursuant to the border exception, that is what must be tied. There must be individualized suspicion that ties the defendant to a transnational offense. The Fourth Circuit in Agbekayan said that just because the government might have probable cause that a defendant has committed a domestic related offense, that is not going to extend a border search and seizure to an electronic device. But Ms. Coleman, I thought you had conceded that there was a transnational nexus here. You're unhappy with the court's decision in Coles' which suggests that border agents can seize and search a phone or at least seize it and do a manual search if there's a transnational nexus to crime at the border. And your argument is that they can't seize it unless there's actual contraband on the opposite. And you're asking us essentially to overrule our precedent. Is that right? Yes, number one, I'm asking you to. Which we can't do as a panel. Well, but I think there's another way that this case can be distinguished from Coles'. What I would say about Coles' is that in Coles' it was important to this court that the defendant was committing an offense at the border in real time. What the court said was that on the facts in Coles' the link between the search of his phone and the interest that justifies the border search was sufficient because the agents there had good reason to believe in the form of two suitcases filled with firearms parts that Coles' was attempting to export the firearms illegally. Well, those are the facts of that case, but that doesn't mean that you need those same set of facts in every case. And this case originated with an investigation into the inter-fraudulent defense contracts and the theft of phones and various other electronic devices and the sale or the fraud related to the acquisition of those devices, some of which had national security implications. So why isn't that yet another factual scenario that fits comfortably under our precedent? So the evidence in this case is that there was not just one fraud scheme. There were essentially three different fraud schemes. One of them was the military goods that were being exported. Then there was a phone fraud scheme and then there was a television fraud scheme. I'd call that a fraud scheme with three objects. Multiple objects. And that's... It's an overall scheme. It's... When looking at what the agents knew about the defendant's involvement in the fraud scheme that affected the export of devices, because that is what the government is saying gives the agent's permission through the border exception to go into her phone. So what the court needs to do is look at what was the evidence relating to Ms. Nkongo's involvement in that export related fraud scheme at the time that she was crossing the border and the border exception was used to seize her phone. What the record shows is that the agents knew that Ms. Nkongo was given some money by Mr. Rozic in September of 2016. It does not say what the amount was. September 2016 predates the date that the military export devices were even shipped. Those were not even shipped from the distributor until October of 2016. The record does not indicate if there were any contacts between Ms. Nkongo from the September 26th time she received cash from Mr. Rozic, whether there was any communication between her and Mr. Rozic from September 2016 until February of 2017. Okay, I just want to be clear. I probably need to go back to your brief, but did you make this argument in your brief? I thought the principal focus of your brief was COLSIS was wrongly decided. You need to overrule COLSIS and adopt the Ninth Circuit's view in Canoe as to what exactly agents can do at the border, not that the facts of this case don't even fit under our existing precedent. Well, I think, Your Honor, what I'm getting to is COLSIS left open. What is the level of suspicion that's necessary in seizing and searching, doing a forensic search of a cell phone at the border? Okay, that may be so, but is that an argument you made in your brief? Well, Your Honor, I believe I argued that at least probable cause would be necessary. COLSIS said there had to be at least reasonable suspicion. In that case where there was a direct link? At least reasonable suspicion to search. It was not a seizure situation solely. They were talking about searches. Here you have this first part. You have the seizure and then the warrant and then the search. There was no search on March 20th. There was a seizure. Correct. And that case says at least reasonable suspicion. And here you have conceded, as far as I'm concerned, that there was probable cause on the 20th to conduct a search because the magistrate judge ordered it on the 29th. He found the probable cause to exist based on the facts. I concede that there was probable cause to search for domestic-related offenses. With respect to Chief Judge Diaz and your question about COLSIS and whether or not that was rightly or wrongly decided, the government has taken the position that evidence of a crime, a search for that as opposed to evidence of contraband, is supported by Supreme Court precedent. And the government makes the claim that cases such as Ramsey, Flores-Montano, and Montoya de Hernandez all support that. But, Your Honors, in those cases, there was contraband at the border first. At page 29 of the government's brief, they support Ramsey for the proposition that the Supreme Court has time and again afforded the government broad latitude in conducting searches at the border to include the opening of mail. Yet when you look at the Ramsey opinion at page 624, the Supreme Court specifically said that while the envelopes in that case were permitted to be opened by the customs officers who had reason to believe that the envelopes contained other than correspondence, the Supreme Court went on to say that the reading of any correspondence inside the envelopes is forbidden. So it would seem that if the border search were broad enough to search for evidence of communications about a crime, as the government suggests, that the Ramsey Court would not have forbidden the reading of correspondence that exists inside the envelope in which the heroin was found, as that might have led customs agents to clues about other heroin being imported. And this was the crux of the Cano opinion. Although it focused on the Supreme Court's opinion in Boyd rather than Ramsey, it went to the same point. A search for communications regarding a crime exceeds the proper scope of the border exception. In Boyd, at page 622 to 623, the Court distinguished between searches for... Is there... Do you have another argument? I mean, as Judge Diaz points out, right now you're asking us to overrule culses by saying that the agents couldn't search for evidence of a transnational crime. And you may have an argument that you can make to the Supreme Court, but we already have precedent about that. So what's your argument under our current precedent? You had suggested that maybe probable cause is necessary.  Is there any other argument you have on why you should win under our existing precedent? Yes, Your Honor. That goes back to my argument about the direct link, the language in culses that the Culses Court said was the linchpin for being the triggering event that permitted the border search of the forensic device for communication. The reason that the Culses Court found it prudent that agents needed to get inside of Culses' phone at that time was in order to see if other USML parts were being imported at that time. And in relying on the Mendez and the Ramos cases, the district court cases from the Ninth Circuit, it's consistent with those cases. Because in those cases, the direct link between the border exception and the manual searches that were done in those two cases was that before the search of the phones in those cases, there was methamphetamine and cocaine found in the defendant's vans or luggage before they did the search. And in the Mendez case, what they said as the rationale for searching for communication at that time was the district court said the phone might contain evidence that additional contraband was entering the country in conjunction with the contraband that the defendant was transporting. Well, in this case, you've got a scheme. I know you say that a good bit of it may have been a domestic fraud scheme, but as Judge King pointed out, the object of fraud can be multiple objects. In this case, one of them was a scheme to export military equipment and then launder the proceeds. And there was evidence, I suppose, that the agents had that Ms. Nkongo's husband was engaged in this scheme, and they had suspicions that she was as well. So why would it have been reasonable for agents to believe that seizing the phone and searching that phone would lead to evidence of the scheme to export military equipment and launder the cash proceeds? Because I argue, Your Honor, that on this record, there's not reasonable suspicion that she was actively involved in the export of the USML data. Razak said that her job was to handle the money. There was no intimation in the record that she ever handled the devices or was in charge of exporting the devices. And so on balance, I would... Well, now you're making an argument that the only thing the agents could look for were the actual contraband, the devices. But isn't money also part of the contraband if it's laundered? Only if there is reason to believe that the money is contraband. And in this case, what you have... I mean, the coroner said... She had evidence she was a conspirator. She's responsible for everything they did. But the last... And the magistrate judge found probable cause. In the record, Your Honor, the last time that Ms. Nkongo was associated with receiving any money was September of 2016, six months before she exited the US border in March of 2017. She had on her $8,500, but she was... It was an ongoing thing. But she was... It was an ongoing thing. It had been going for a long time. They had all kinds of evidence before these two stops in Miami about all this... The people who were involved, they had an inside guy that turned on them up in Virginia or Maryland. Right, Mr. Razak. But he did not provide any information to the agents before this seizure that Ms. Nkongo had received any money since September of 2016. And I don't think it's reasonable when you have a mother traveling with her two children to a foreign country for nine days and she has $8,500 on her. I would say that that is consistent with innocent travelers with a parent traveling with two minor children to a foreign country for nine days. The only thing she had on her was $8,500. And she was taking her children... And she lied about that. She said she only had $5,000. And what is the significance in terms of linking that money to reasonable suspicion to believe that she was committing an export-related offense? Because if there is no tie to the export-related offense, then based on Agbekayan, the border search is not triggered. So there has to be something more. There has to be more of a direct link between that money on that day and the reason that the customs agents took her phone for the purpose of a forensic search trying to tie her to or look for information of a transnational offense. And so I would submit that even if Coles is still good law, it's distinguishable because the court emphasized... But it is good law. You've got to admit it's the law of the circuit. It's good law in the circuit, Your Honor. You can argue it's distinguishable, but you can't argue it's bad law. It's good law in the circuit, Your Honor, but it's distinguishable because there is not the direct link that she was committing a border-related offense or a transnational offense when she was crossing the border on March 20th when she was coming back in her... She was involved in a vast conspiracy with multiple objects spelled out in the affidavit to seek the search warrant that established probable cause on the 29th, which established it was probable cause on the 20th. They had probable cause on the 20th, which is more than reasonable suspicion that they've talked about for the seizure in the other case. And again... This is a much better case than that case. And again, I would ask the court to review the warrant in which it was clear that the agents were not framing the case as probable cause. The warrant told them to go search, to search the six... Devices. Devices that had been seized on the 20th and preserved intact until they got the search warrant. Now, you talk about a delay. You haven't got around to that, but... They were prudent under these facts. They were discussing with each other whether they really needed a warrant, whether they could just go ahead and search. But they made a decision to seek the warrant, and they got one, and then they searched. What you're complaining about, they searched herself up. And I see that I've eaten into my time. I don't want the court to think that I do not want to address that issue about the unreasonable delay. I think my brief sets forth in great detail the factors for the court to consider. And I would simply say that the delay... Our position is that the delay to get the warrant was not reasonable because the record shows that by March 11th, nine days before the agents even seized the phone, the agents made the decision that they were going to seize it. So that does not explain the delay between March 11th and March 29th when they ultimately applied for the warrant. If there was concern as to whether or not they needed a warrant, that was 18 days that they should have been speaking with the U.S. Attorney's Office or with their legal counsel in Department of Homeland Security. But if this falls within the border exception, then we don't... They didn't need a warrant, right? So the fact that they got one doesn't make a difference. I would still submit that unreasonable delay would affect consideration as to whether the ultimate border search was reasonable. And the Coles' opinion did also leave open that issue as to whether the delay between the seizure and the ultimate border search, whether that would affect the reasonable... I thought you said there wasn't a border search, there was a border seizure. There was a search under a warrant. So the district court in my case said that this was a search pursuant to a warrant. The government in its brief took the position that this was a... The district court's opinion says it wasn't a search on the 20th, it was a seizure. And it was a search pursuant to a warrant. Correct. I read the opinion too. Yes, so the district court said this was a search pursuant to a warrant. The government in its brief said that this was a search pursuant to the border exception. That's what their first argument headline is. And that's what Coles' says, right? In Coles', the agents took the phone off site later in time, searched it, and we said that's a search pursuant to the border exception. Yes. Yes, that is what Coles' says. But I think that in either analysis, whether the search was ultimately a border search or a search pursuant to the warrant, the consideration of the delay and whether or not it was reasonable is still a necessary factor. So it would still... What's your authority that it matters, for the border exception, how long they waited to start their search of the phone? Well, Coles' did address that. They didn't have to decide it because in that case, Coles' was arrested, so he never claimed a possessory interest. That had to do with how long the phone was away from him, right? It did. But I think it's even more important in my client's case because she was not arrested. She was not detained. So the similar considerations that the courts make about being deprived of one's possessory interest are ones that the court would make in the case of a forensic search. Did she ever... This may not be in the record, but did she ever get the phone back? I mean, once they found that there's evidence of a crime, they could keep it if they wanted to. She did get it back, Your Honor. But they gave it back. Around 45 days later. And in the interim, she did hire an attorney to assist in getting the phone back. So she was consistently asserting her right and her need in the possessory interest of the phone. All right. Thank you, Ms. Holden. Thank you. Mr. Rockey? May it please the court, Your Honor. Adam Ake for the United States out of the District of Maryland. So just to start off, in terms of framing the case, I think the court has appreciated a little bit more than I was expecting even. The focus at this point in the investigation was recovery of signals intelligence equipment, which is the reason that this was initially a customs case and defense criminal investigative service case, even though later it morphed into the exploration of the stolen goods scheme. But at the time of Agent Merker's direction to CBP at the Miami airport, this case and their almost exclusive focus was on getting the signals intelligence equipment back. This was a suite of very sensitive mobile signals intelligence-slash-targeting equipment that was absolutely munitions-based and ITAR-banned from any kind of export. And it's sensitive enough that even domestic law enforcement can't use this type of equipment. So they had eventually found that the same group that had fooled a cleared contractor into sending one of these suites to a warehouse in Virginia was also the same group behind a scheme to defraud T-Mobile of several thousand iPhones and several hundred iPads, as well as what ultimately became sort of the big moneymaker at the end was a scheme to defraud by convincing a Virginia-based contractor to send about 2,600 very, very high-end flat-screen televisions to the scheme in various locations in Virginia. And so the reason a lot of that got lost in the sauce in terms of where it kind of plays out in the trial record is because it was only those latter two objects, the iPhones and the, so essentially all the commercial electronic equipment, which got fenced and then turned into the proceeds that were then laundered. And this was a money laundering trial. So it's easy to kind of focus on that fraud scheme now and sort of looking at it just from the trial record. But at the time, back in March of 2017, those, that suite of electronic equipment had not yet been located. And so Agent Merker was focused on that. They had turned Khalid Razak, who was a Virginia-based member of the scheme. They had used him in an undercover operation to get $110,000 of the proceeds back, which was his share and what he was supposed to also distribute to one of his co-conspirators located here in Virginia, I should say. And Razak had already shown them communications with leaders of the scheme. So he was engaged not only with Peter Nakulu, who was Eunice Nakagawa's husband, but also a still not fully identified individual who went by the name of Mer. And there was WhatsApp screenshots that are provided in supplemental joint appendix that showed that they were actively still trying to, or that those members of the scheme had not yet sold or finally delivered the communications equipment, at least suggested that it was still somewhere in transit. And so, in addition, Razak had given the agents information that he had provided at least $200,000 in cash  of the consumer electronics that were fenced. And he had given that to her back in September. It's hard to get rid of $200,000 in cash. I mean, there was later evidence that showed that she had deposited some of it in her children's bank accounts and wired it from those accounts to Peter in Nigeria. But there was every reason to believe that she still had a lot of bulk cash. And when she exited the country on March 11th, sure enough, she was carrying the bulk cash. And Razak had already conveyed to the agents that her role in the scheme was in large part to get money back to Peter from the U.S.-based fence operation. And so her job was to get a lot of that money back to her husband. So what we had, in terms of reasonable suspicion and particular suspicion, back in March 20th to seize these devices was that not only did we have her participation in getting money back in terms of proceeds from any part of the fraud scheme to her husband, and part of the fraud scheme, as the court has correctly already identified, was the illegal export of sensitive military equipment. But then we also had some confirmation that she was actively still conveying and participating in promotional money laundering as of March 11th because she had $8,500 in cash. Again, she had dissembled or affirmatively misrepresented how much she was actually carrying. But the fact that she's going to Cuba, a country with very diminished relations with the United States and certainly not really cooperative in terms of any kind of extradition, and meeting with him there, I think both the international money laundering and certainly the illegal export of military items provided the international nexus that COLSIS requires. And at that point, the agents had full authority to seize and search her electronic devices for evidence, not just contraband, as the court fully appreciates. At the time of the seizure, of course, we hadn't decided COLSIS. Right. So there was even less precedent with respect to how these agents were supposed to proceed. Exactly. And that really does account for some of the delay, Your Honor, because it was post-Riley but pre-COLSIS, and we didn't have a definitive interpretation from the Fourth Circuit on how Riley was going to affect the border search. You say you had authority. You mean you had reasonable suspicion and probable cause? Absolutely, Your Honor. At this point, we had... If you had probable cause, you had reasonable suspicion. Of course. And you're saying you had probable cause on March 11th? I'm just saying the question at the time, post-Riley, was whether or not we needed a warrant. And we're waiting for... We still didn't have clear Fourth Circuit authority post-Riley. And the search here was pursuant to a warrant. And that was why the warrant was signed. Which is probable cause. Correct, Your Honor. Of course. But on the 29th. But you're saying you already had that probable cause on the 11th. I said earlier, when she was arguing, at least you had it on the 20th, it looked like. Well, the probable cause was augmented on the 11th with the discovery of the bulk cash that she was taking to her husband. Right. And that was... Was it augmented further on the 20th? And by the 20th... Between the seizure on the 20th and the obtaining of the warrant on the 29th, there was no additional information. How about between the 11th and the 20th? Was there further evidence? No, Your Honor. So you had it... On the 11th. Whatever you had, you had on the 11th. By the end of the 11th, yes, Your Honor. So... Well, you knew she came back in the country on the 20th and knew what happened on the 20th. Right. And in terms of delay, I'm glad Judge Rushing already appreciated that it would be a bizarre outcome given these facts, which even today would support a warrantless search based on CULSAs and OGBECON. Under these facts, with this particularized suspicion of transaction fraud... That was one of the explanations for the delay that the Homeland Security people said they didn't need a search warrant or you didn't need a search warrant, and the U.S. Attorney's Office or the Justice Department felt it was prudent to get a search warrant.  Just out of prudence, Your Honor. Correct. And they acted prudently, I presume, to the, I guess, the Justice Department's position and got the search warrant on the 29th. That's correct. And that's when the search occurred. Correct. And as Judge Rushing observed, not only was it... current precedent on these facts, could they have done the full search without a warrant, but they could have kept the phones until the trial. And there was no requirement, once they were revealed, to have all this evidence of communications regarding the international money laundering and her participation in the criminal activity, which all emerged during trial and certainly that Judge Hazel considered later in sentencing. But it would be something of a bizarre outcome to find that the delay somehow invalidated the warrant when we didn't even... the agents didn't even require a warrant. Did you try the case? Did you try the case? I did, Your Honor. I was kind of in and out during the earlier parts of... So the decisions back in 2017, I wasn't yet involved with the case, but then later got involved, yes, sir. So I think the court fully appreciated... I was ready to... I'd gotten blazing on the distinction between evidence and contraband, but I think that's really foreclosed by the Supreme Court's precedent. Warden V. Hayden, this distinction, and this circuit has certainly not recognized it, and I wouldn't encourage... So you do make... I mean, and I think you're right. I mean, given our precedent, I don't know that it matters whether there was contraband or evidence of contraband, but you do make an argument that there was actual contraband on the phone, and, I mean, that didn't seem like a fairly... Your Honor, I think my co-counsel, who wrote the briefing, is conveniently in Albania right now. I think that was more just... Well, we can issue an order. What could have been... The reasons why there shouldn't be a distinction between the evidence and actual contraband is the phones are... Even in this case, it would have been conceivable, but the agents did not have contemporaneous beliefs that that was the case. Even so, I think Coles is... It's pretty clear that... It's analogous. Coles was involved in weapon smuggling. His phone, there's no way the phone could have contained the weapons themselves. This court certainly didn't find a problem with looking for evidence of ownership, intent, possession, all those things that were the reasons that his phone was forensically searched, was to look for that type of evidence, not just the physical evidence of contraband. And in preparation for this, I actually did go back and look at the original Border Search Authority in one stat, 29. Pretty interesting looking at law from the earliest days of the United States. Really fascinating in terms of how it read, but it certainly undermined this idea that customs officials back in 1789 were only looking for contraband. It actually reads more like a manual on how to conduct these searches, but it directed in one stat, 43, the paragraph directing these inspectors to go on the ships to look at all the papers and then determine whether there's evidence that any discrepancies between what was on the manifest and what was actually there to be taxed was intentional. So they're looking for, I mean that is the original Border Search Authority and they were told to look for evidence of intent, not just looking for the goods themselves. And I think this goes to this idea that how can the HSI, CBP, ICE, how can they enforce these statutes without making cases? So it's not just intercepting or interdicting contraband, it's about actually making cases that will lead to prosecutions and that requires not just the contraband itself, especially if there's a physical separation between the person being investigated and the contraband. It requires things like evidence of possession, intent of what they're going to do with it, all these things, which still has to be part of the package or else we hobble our law enforcement's ability to enforce these statutes at the border. So I think it would be silly to make this artificial distinction between only allowing a search for physical contraband. Certainly ICE has a mandate and CBP has mandates to enforce our human trafficking and human smuggling laws. Certainly humans can't fit in cell phones, so if we limited the border search authority to only contraband, we would foreclose these agencies' ability to investigate these cases. You mentioned the statute, but I think your colleague on the other side points to an almost equally old case called Boyd where the Supreme Court purported to make a distinction, make that very distinction which you reject in this case. Well, Your Honor, it was interesting that, and the reason I looked back at the one stat instruction was that Boyd, the issue with the evidence that Boyd took issue with was that it was not evidence that was examined at the border. It was evidence that, Boyd really involved a challenge to a statute that required under penalty of essentially being, well, okay, so Boyd was a challenge to a statute that required importers to provide their records much after the fact on basically a subpoena from the U.S. attorney who had suspicions that they might have been engaged in customs evasion. And so long after the goods are already in commerce in the United States, these importers would have to, if the U.S. attorney made this subscription, then they would have to turn over records and personal papers. And it was on threat of if they failed to do so that they would be presumed guilty of the importing offense that they were being accused of. So it did not involve searches at the border. Certainly the court distinguished what that statute required from the border search in the case, and I think that's where that language came from. But the real reason that that, the real grounds on that case was decided was really the Fifth Amendment self-incrimination grounds as well as what we would call today illegal or improper burden shifting. It had nothing to do with the scope of the border search itself. So I think that I had to go back and look at that case too. But in any case, Worden v. Hayden actually explicitly abrogated any kind of distinction between the instrumentalities and fruits of crime versus mere evidence. And so I think that Boyd is not good law at this point anyway. I'm happy to answer any of the questions, but I think that that certainly, and one last, so I already addressed the delay issue. The sentencing issues, the counsel hasn't raised those, but certainly look at the fact that even if, well, I think it's pretty clear for the record that Judge Hazel properly applied the sentencing guidelines and the cross-reference, as well as the issue of refusing to grant a Chapter 3 downward adjustment for lower responsibility. I think he made his record clear, and I don't think there's any issues unless the court has any questions on the sentencing issue there. Thank you very much. Thank you, Your Honor. Ms. Coleman. Thank you. I'll be brief. I know I ate into my time before. Just with respect to what the government ended with with respect to Hayden abrogating Boyd, I think today Hayden would not survive Riley. And the reason that I say that is Hayden was a search incident to lawful arrest case in which the court held that the search incident to a lawful arrest extends to items, even items that are purely of evidentiary value only. So Hayden said that whether searching under a search warrant or search incident to lawful arrest, there's no reason to distinguish between intrusions to secure mere evidence from intrusions to secure contraband. The reason I say that I don't believe Hayden would survive Riley, at least in the context of the forensic search of cell phones, is because Riley said that, pursuant to the search incident to a lawful arrest of a defendant, you cannot search the cell phone. The search incident to lawful arrest exception becomes untethered in the context of a cell phone. You cannot go into the cell phone to look for mere evidentiary value. So I don't think that Hayden's holding, though it abrogated Boyd, would be applicable in this case post-Riley because Riley specifically said you cannot search for evidence inside a cell phone search incident to a lawful arrest. I also want to just touch on Ramsey again quickly because there what the Supreme Court said seems to fly in the face of the Coles' opinion. Ramsey at page 624, which was a border search case, said that the reading of correspondence is forbidden even if the contraband is in the envelope with the correspondence. And so that was the justification given in the Coles' case that there was this direct link between the contraband that was at the border and therefore we look for evidence relating to it for the future importation or other ongoing importation. But Ramsey specifically said that notwithstanding the heroin that was found in these envelopes coming from Thailand, we're not going to permit customs agents to read the correspondence, even though by reading the correspondence maybe that would have permitted them to stop other ongoing efforts of heroin importation. With respect to whether there was binding Fourth Circuit precedent at the time of the search in this case, this case the search predated Coles' and what was not in existence in the Supreme Court or Fourth Circuit at the time of the seizure and search, the border exception for forensic searches of electronic devices. There was no case law in the Fourth Circuit saying that a forensic search of an electronic device was permissible. Similarly, Coles' was not in existence, so there was no case saying that the border exception could be expanded to search for information relating to an offense. The only case in the Fourth Circuit that I've come across that was in existence at the time was the 2005 case of United States v. ICS. Now that was not necessarily a Fourth Amendment case that was challenged on First Amendment grounds where a defendant was bringing child pornography and obscene materials across the border. But even in that case, all that the agents first discovered the child pornography in a hard copy photo album and then used that as the reasonable suspicion to go into the computer. And even in going into the computer, all that they did was a manual search to either confirm or dispel their suspicion. They did not do a forensic search. So I would say that based on the authority that was in existence in the circuit at the time that the seizure and search was done in Mr. Congo's case, there was no authority to do a forensic border search looking for evidence of information relating to the offense as opposed to contraband. Thank you very much for your time. All right. Thank you, counsel. We appreciate the arguments from both counsel this morning. We'll come down and greet you and move on to our second case.
judges: Albert Diaz, Robert B. King, Allison J. Rushing